IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LISA A. REYES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 16-cv-1008-JPG-CJP |
| | ) |
| NANCY A. BERRYHILL, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant.[1] | ) |

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Lisa A. Reyes, represented by counsel, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff filed for DIB and SSI on July 29, 2013, alleging a disability onset date of February 27, 2012. Her claim was initially denied on January 2, 2014, and again upon reconsideration on June 12, 2014. On December 11, 2014, plaintiff filed a concurrent application for SSI, which was consolidated with her pending claims. Administrative Law Judge (ALJ) Kim S. Nagle conducted an evidentiary hearing on February 12, 2015, at which plaintiff orally amended her onset date to February 28, 2012. ALJ Nagle issued an unfavorable decision on March 5, 2015. (Tr. 29-47.) The Appeals Council denied review and the decision of the ALJ became the final agency decision. (Tr. 1.) Administrative remedies have been exhausted, and a timely complaint was filed in this Court.

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. *See* https://www.ssa.gov/agency/commissioner.html (visited Feb. 7, 2017). She is automatically substituted as defendant in this case. *See* Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g).

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ's assessment of her residual functional capacity ("RFC") was legally insufficient because it was expressed in terms of the ability to do work at the light exertional level and the ALJ did not determine plaintiff's RFC on a function-by-function basis.

2. The ALJ erred by failing to consider the functional effects of plaintiff's sleep disorder.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as

---

[2] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity ("RFC") and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008); *accord Weatherbee v. Astrue*, 649 F.3d 565, 568-69 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984); *see also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative

answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. . . . If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, *i.e.*, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## **The Decision of the ALJ**

ALJ Nagle found that plaintiff met the insured status requirements through December 31, 2014, and that plaintiff had not been engaged in substantial gainful activity since February 28, 2012. The ALJ then opined that plaintiff had severe impairments of degenerative disc disease,

4

chronic obstructive pulmonary disease ("COPD"), and obstructive sleep apnea. The ALJ also determined that plaintiff had the RFC to perform light work, with the exception that plaintiff could only occasionally climb ladders, ropes, and scaffolds, and frequently crawl or climb ramps or stairs. Plaintiff was also limited to frequent exposure to extreme cold, heat, or pulmonary irritants such as fumes, odors, dust and gases. After finding that plaintiff could perform past relevant work as a sorter/pricer, security guard, registration clerk, or hand packager, ALJ Nagle determined that plaintiff was not disabled. (Tr. 29-47.)

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1. **Agency Forms**

In her initial disability, work, and function reports, plaintiff indicated that her highest level of education was the seventh grade and that she attended special education classes. She also completed specialized job training as a security guard. (Tr. 211.)

Plaintiff took Prozac for depression; ProAir, Albuterol, and Advair for COPD; Trazadone for insomnia and depression; and Prazosin for anxiety, post-traumatic stress disorder ("PTSD"), and panic attacks. (Tr. 213.) She also took Ibuprofen, Ventolin HFA, Nortriptyline, and Ciprofloxacin. (Tr. 237.) Plaintiff alleged that COPD, insomnia, depression, PTSD, panic attacks, anxiety, and severe lumbar pain limited her ability to work. (Tr. 224.) She could not sit, stand, walk, or lay down for more than ten minutes and needed approximately ten naps per day. (Tr. 229.)

Plaintiff had difficulty breathing and experienced constant back pain. She did not like

crowds or being around other people.  She had anxiety attacks.  Plaintiff slept about three to four hours each night and had nightmares.  She could not stand long to cook and did light housework such as sweeping and laundry.  (Tr. 230-33.)

Plaintiff's condition limited her to lifting five pounds; squatting, kneeling, and bending for "not long;" standing for twenty minutes; reaching "not far;" and walking, at most, a half block.  Her memory was "real bad."  Plaintiff could pay attention for one hour and could not follow written or spoken instructions well.  She did not handle stress or changes in routine well.  She got along with authority figures "ok."  (Tr. 235-36.)

Plaintiff was previously employed as a pricer at Salvation Army, as a security guard, as an application "intaker" at Energy Association, as a line worker at a factory, and as a housekeeper at a nursing home and motel.  (Tr. 239.)

As a pricer, plaintiff frequently lifted twenty-five pounds; stood; walked; sat; stooped; crouched; handled, grabbed, or grasped big objects; and wrote, typed, or handled small objects.  She lifted objects out of big boxes and walked half of the warehouse during the entire eight-hour workday.  She priced items that came in and sorted things.  Plaintiff lifted objects, walked and stood a lot, and stooped into big boxes.  (Tr. 240.)

As a security guard, plaintiff frequently lifted less than ten pounds; reached; walked, stood; wrote, typed, or handled small objects; and supervised other people.  Plaintiff stated she did a lot of walking and paper work and counted cars.  She also indicated she used technical knowledge or skills.  (Tr. 241-42.)

As an application "intaker," plaintiff frequently lifted less than ten pounds; walked; sat; and wrote, typed, or handled small objects.  She indicated she completed a lot of hand written applications.  (Tr. 243.)

6

As a line worker, plaintiff packed Capri Sun and stacked heavy boxes. There was a lot of lifting and walking. Plaintiff frequently lifted ten pounds; walked; stood; stooped; kneeled; crouched; crawled; handled, grabbed, or grasped big objects; and reached. She also used machines, tools or equipment and used technical knowledge or skills. (Tr. 244.)

As a housekeeper, plaintiff walked; stood; climbed; stooped; kneeled; crouched; reached; and wrote, typed, or handled small objects. She frequently lifted less than ten pounds. Her duties included cleaning rooms by sweeping, mopping, wiping things off, cleaning toilets and sinks, and vacuuming. She also had to lift mop buckets throughout the day and carry a vacuum cleaner. (Tr. 245.)

In subsequent reports, plaintiff stated her mobility and range of motion were very limited due to severe pain and discomfort. (Tr. 249.) Virtually every aspect of her day and everything she did was more difficult because of her conditions. (Tr. 252.)

## 2. Evidentiary Hearing

ALJ Nagle conducted an evidentiary hearing on February 12, 2015. (Tr. 54-105.) Plaintiff was represented by counsel.

Plaintiff testified that she was fifty years old at the time of the hearing. (Tr. 59.) Plaintiff did not have any dependents but did take care of her grandchildren – ages eleven and six – once per month. Plaintiff completed the seventh grade and unsuccessfully attempted to earn her GED. (Tr. 61.)

Plaintiff most recently worked at Salvation Army in 2009 but quit because of her COPD. She could not breathe due to the dust, heat, and cold. Her carpal tunnel also made it difficult to handle objects. (Tr. 62.) Plaintiff also worked part time in 2001 and 2002 for Madison County where she assisted individuals with their energy bills during the winter. She worked in an office

7

and dealt with the public. Plaintiff also worked for about one month at a factory. (Tr. 63-64.) She was a full time housekeeper as well, during which she lifted, at most, twenty-five pounds. (Tr. 65.)

On an average day plaintiff made coffee, watched the news, and attempted to do light housekeeping. She made microwave meals for herself and was able to take care of her grooming and personal hygiene. She watched television programs and read. She did not like dealing with the public and did not go outside much. She went to the store once per month. Plaintiff slept a lot throughout the course of the day because she did not sleep at night. She had a driver's license but did not have a car. (Tr. 66-68.)

Plaintiff explained that her depression and anxiety prevented her from working. Beginning three to four years before, plaintiff could not go to a store without feeling as if she was going to pass out. Plaintiff got along with her coworkers at her previous job. (Tr. 69.)

Plaintiff was taking Nortriptyline and Citalopram for depression and anxiety, Trazadone for problems with sleeping, Zantac for GERD,[3] albuterol and Symbicort for COPD, and paroxetine and ibuprofen 800 milligrams. (Tr. 70-77.)

Plaintiff experienced shortness of breath, which limited her ability to climb stairs, clean, bend, and walk. Dust, cold, and heat irritated her COPD. She also had numbness in her hands, which began three years prior and was a result of carpal tunnel. She wore a hand brace to help. Plaintiff also had numbness in her legs from a pinched nerve, which began two years prior. (Tr. 78-80.)

Bending, sitting, and standing for too long exacerbated plaintiff's back pain. She could sit, stand, and walk for no longer than a half hour each. She could lift up to about ten pounds.

---

[3] GERD (gastroesophageal reflux disease) "is a chronic digestive disease." *GERD*, MAYO CLINIC, http://www.mayoclinic.org/diseases-conditions/gerd/basics/definition/con-20025201

(Tr. 82-84.) Throughout the course of an eight-hour workday, plaintiff could sit for a collective two to three hours. She could stand for a total of two hours, at most, but she had good days and bad days. On a bad day she could not get out of bed. On a good day she could sweep a floor and stand at the sink to wash dishes without sitting down. She had approximately two good days per week. (Tr. 88-89.)

Plaintiff could perform household chores for approximately fifteen minutes to a half hour before she needed to sit down. She also dropped things because she could not feel them due to her carpal tunnel. Her carpal tunnel also limited her ability to pick up small objects like a screw or paperclip. She had difficulty with grip strength because of pain in her wrist. (Tr. 85-86.)

Plaintiff stated she had sleep apnea, which prevented her from sleeping at night, although she was "never really diagnosed" with it. She underwent two studies, during which she was awake every half hour. She slept off and on throughout the day and usually took about four or five naps that lasted fifteen to twenty minutes each. Plaintiff also had shoulder problems, which may have originated from a car accident. (Tr. 87-88.)

Plaintiff believed that her conditions would cause her to miss work. When she was previously employed, she had to miss ten to twelve days per month for doctor appointments and her inability to cope. Plaintiff had suicidal thoughts. (Tr. 90.)

Plaintiff avoided her roommates because she did not want to deal with other people. When she was forced to interact with others she got jittery and nervous. She also became tearful multiple times per day. (Tr. 91.)

Plaintiff opined that her conditions would impact her ability to keep up with a production flow or work pace. She could concentrate on a television show for a half hour. (Tr. 91-93.)

Suman Srinivasan, a vocational expert (VE), then testified that plaintiff's previous job at

9

Goodwill[4] (a sorter/pricer) was considered light, skilled, SVP 5, and medium as performed; her position as a security guard was light, semi-skilled, SVP 3, and light as performed; her job as a registration clerk was sedentary, semi-skilled, SVP 3, and sedentary as performed; and her jobs as a hand packager were light and medium, unskilled, and SVP 2. (Tr. 93-97.)

The ALJ then posed several questions to the VE involving a hypothetical individual with plaintiff's age, education, and work history. The individual had light exertional ability and could only occasionally climb ladders, ropes, and scaffolds; no more than frequently climb ramp and stairs and crawl; and could no more than frequently be exposed to extreme temperatures of cold and heat or pulmonary irritants such as fumes, odors, dust, and gases. The VE opined that such a person could perform plaintiff's past work as a security guard, hand packager when done at the light level, sorter/pricer, and registration clerk. (Tr. 98.)

For the next hypothetical, the ALJ asked the VE to consider an individual who had the same limitations as the first hypothetical individual, but was also limited to frequent manipulation and feeling in the upper extremities, including bilateral fingering and feeling. The VE opined that such an individual could perform plaintiff's past work as a sorter and pricer, registration clerk, and security guard. (Tr. 99.)

The ALJ also asked the VE to consider a hypothetical individual with the cumulative limitations of the first two hypothetical individuals, who also was limited to work that required no more than simple, routine changes, and no more than occasional interaction with the public. This person could still be around other people. The VE opined that these additional restrictions would preclude the performance of plaintiff's past work. However, jobs existed in the state and national economy that such a person could perform. (Tr. 99-100.)

---

[4] The VE testified as to plaintiff's previous employment at "Goodwill." The Court believes the VE meant to testify to plaintiff's work at Salvation Army.

10

For the fourth hypothetical, the VE was asked to consider a person with the same limitations who would also have to alternate between sitting and standing at will at her work station, but was not off task more than ten percent of the work period. The VE opined that jobs existed in the state and national economy that this individual could perform. (Tr. 100.)

The ALJ then asked the VE to consider a person with the same limitations who, due to pain and anxiety, would require intermittent and unpredictable breaks resulting in being off task at least twenty percent of the work period. Such limitations would be preclusive of all employment. (Tr. 100-01.)

The VE testified that a person who could only sit for three hours total in an eight-hour workday would be unable to maintain fulltime employment. (Tr. 101-02.)

The limitations to simple, routine changes in work settings would preclude an individual's ability to carry out detailed, written, or oral instructions and limit the person to unskilled work. (Tr. 103.)

An employer would tolerate an employee being off task no more than ten percent of the time on a continuing basis. No more than one unscheduled absence per month, on a continuing basis, is permitted. All unskilled work by definition is simple, repetitive, and routine. (Tr. 104).

### 3. Medical Records

Plaintiff received treatment from Mr. Edward Anderson, P.A. at Southern Illinois Healthcare Foundation from 2003 through 2014. She presented with a variety of conditions, including back pain, shoulder pain, hyperlipidemia, GERD, COPD, insomnia, sleep apnea, depression, and anxiety. On June 14, 2012, plaintiff complained of low back and shoulder pain. She flipped her truck two weeks before but the record indicates her back pain was chronic. Mr. Anderson prescribed baclofen for muscle spasms, ibuprofen 800, and prednisone. (Tr. 302.) On

July 9, 2013, plaintiff reported severe low back pain. Mr. Anderson ordered an MRI of her lumbar spine but the record does not establish that plaintiff pursued one. (Tr. 300-01.)

On July 31, 2014, plaintiff presented to the Gateway Regional Medical Center with low back pain, which she rated at an eight out of ten. A review of radiographs dated October 12, 2011, revealed no fracture or listhesis of the lumbar spine. Mild degenerative disc disease and lower lumbar facet anthropathy were present. The oblique films did not demonstrate spondylolysis. A physical examination demonstrated tender bilateral paraspinal areas and vertebral tenderness that was not appreciated. There were no skin changes. Plaintiff's range of motion in all extremities was intact. She was diagnosed with bilateral paralumbar muscle spasms, administered a Toradol injection, and prescribed Norco. (Tr. 591-96.)

On August 4, 2014, plaintiff presented to Mr. Anderson with complaints of "some back pain." Mr. Anderson prescribed Flexeril. He further advised plaintiff to apply heat and sports cream to her back and wear a back brace. (Tr. 599.)

On November 13, 2014, plaintiff received an MRI of her lumbar spine, which revealed no fracture or listhesis. Lower lumbar spondylosis and facet arthropathy with significant neural foraminal stenosis bilaterally at L4-L5 and L5-S1 were noted. Additionally, there was probable impingement of the right S1 nerve root in the lateral recess at the L5-S1 level. No high-grade central canal stenosis in the lumbar spine was shown. (Tr. 355.)

4. **Dr. Harry Deppe's Psychological Examination**

On December 5, 2013, Dr. Deppe conducted a psychological examination of plaintiff. (Tr. 324-27.) Plaintiff stated that she experienced back pain but was not receiving treatment for it at that time. She described her sleep as "fair." (Tr. 325.)

Dr. Deppe opined that plaintiff's ability to relate to others, her ability to understand and

follow simple instructions, and her ability to maintain attention required to perform simple, repetitive tasks was intact. Further, her ability to withstand stress and pressures associated with day-to-day work activity was "good." Plaintiff's general prognosis was "good." (Tr. 326.) Her diagnoses included adjustment disorder with mixed emotional features, back pain, and COPD. (Tr. 327.)

### 5. Dr. Vital Chapa's Physical Examination

On December 5, 2013, Dr. Chapa conducted a physical exam of plaintiff. (Tr. 329-31.) Plaintiff reported back pain that prevented her from standing and washing dishes. She had back pain when she walked and had to lean on the cart when she shopped. Sitting in a truck also caused her pain and she could not stand for long periods. The pain had been present for about three to four years, and she rated it at an eight out of ten. She also reported insomnia. (Tr. 329.)

Dr. Chapa noted that her motor examination revealed no specific motor weakness or muscle atrophy; her knee and ankle reflexes were symmetric, as were her triceps and biceps reflexes; an examination of the musculoskeletal system revealed no evidence of joint redness, heat, swelling, or thickening; there was no evidence of paravertebral muscle spasm; plaintiff was able to perform both fine and gross manipulations with both hands and her hand grip was five out of five bilaterally. Plaintiff was able to appreciate pinprick sensations to both lower extremities; her lumbosacral spine flexion was normal; her straight leg-raising test was negative bilaterally; she had full range of motion of the joints; her cerebellar function was grossly intact; and there was no evidence of lumbar radiculopathy. Plaintiff was able to ambulate and bear weight without any aids and her gait was normal. Her lungs were clear to auscultation with no wheezing, cyanosis, or clubbing. (Tr. 330-31.)

13

6. **State-Agency Consultant Records Reviews**

On December 27, 2013, Dr. Jhaveri conducted a records review of plaintiff's file and found that plaintiff's conditions were non-severe. (Tr. 108-14.) Dr. Hinchen conducted a records review of plaintiff's file on June 10, 2014, and affirmed Dr. Jhaveri's conclusions. (Tr. 115-20.)

On December 13, 2013, Dr. Terry Travis completed a mental RFC assessment of plaintiff. He found that any of plaintiff's impairments related to a mental disorder were non-severe. (Tr. 111-14.)

On June 9, 2014, Dr. Russell Taylor conducted a mental RFC assessment of plaintiff. He found that plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and ability to respond appropriately to changes in the work setting. (Tr. 122-23.)

## Analysis

Plaintiff's first argument is that the ALJ's assessment of her RFC was insufficient because it was expressed in terms of the ability to do work at the light exertional level, rather than on a function-by-function basis.

Plaintiff cites *Nolen v. Sullivan*, 939 F.2d 516, 518 (7th Cir. 1991), which held that an ALJ "must list the specific physical requirements of the previous job and assess, in light of the available evidence, the claimant's ability to perform these tasks." The Seventh Circuit Court of Appeals has narrowly construed *Nolen* and held it inapplicable where the ALJ considers the claimant's specific job and there is evidence in the record of the duties of those jobs. *Cohen v. Astrue*, 258 F. App'x 20, 28 (7th Cir. 2007). Moreover, "[a]lthough the RFC assessment is a

function-by-function assessment, the expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient[.]" *Knox v. Astrue*, 327 F. App'x 652, 657 (7th Cir. 2009).

Here, ALJ Nagle provided a lengthy narrative discussion of plaintiff's symptoms, plaintiff's testimony, the medical records, and the consultative examinations. (Tr. 32-47.) Additionally, ALJ Nagle stated that she utilized plaintiff's work history and testimony, along with the testimony of the VE, to establish that plaintiff could perform past relevant work. (Tr. 43.) *See Metzger v. Astrue*, 263 F. App'x 529, 533 (7th Cir. 2008) (finding that an ALJ may rely on VE testimony to determine a claimant can perform previous work). Plaintiff asserts that the VE's testimony was not based upon consideration of plaintiff's functional limitations because the ALJ did not conduct a function-by-function assessment when posing the hypotheticals. However, the VE testified that he listened to plaintiff's testimony and reviewed the record, which sufficiently developed plaintiff's job duties. (Tr. 93-94.) Therefore, the ALJ's conclusion that plaintiff could perform light work was not erroneously generic in light of the evidence in the record.

Plaintiff, however, asserts that the ALJ failed to build a logical bridge between her "partial crediting of the 2014 MRI result that Plaintiff had significant stenosis of the lumbar spine with probable nerve root impingement" and her conclusion that plaintiff was restricted to light work. (Doc. 17, p. 15.) Notably, plaintiff does not identify any evidence that the ALJ overlooked or that otherwise contradicted her finding that plaintiff was limited to light work due to back issues.

Actually, plaintiff makes no substantive challenge to the RFC assessment at all. Instead, plaintiff argues that "light exertion describes several optional and potentially conflicting

15

capacities." (Doc. 17, p. 13.) This is incorrect; "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time." SSR 83-10, 1983 WL 31251, *6 (Jan. 1, 1983). ALJ Nagle found that plaintiff could meet these requirements and, in the absence of any substantive challenge, any technical flaw in the expression of the RFC assessment is harmless.

Plaintiff cites two non-authoritative cases from the Southern District of Indiana and the Eastern District of Wisconsin.

In *McCollum v. Astrue*, No. 07-CV-1016-JPS, 2012 WL 4760722 (E.D. Wisc. Oct. 5, 2012), the ALJ found that plaintiff had severe impairments of flat feet, calluses, and early degenerative arthritis of the knee but did not explain how they affected the claimant's ability to sit, stand, and walk. Here, ALJ Nagle provided a complete discussion of the medical evidence related to plaintiff's back condition and concluded that, based on the treatment and physical examination, plaintiff could meet the requirements of light work.

*Lawson v. Colvin*, No. 1:14-cv-01851-JMS-MJD, 2015 WL 5334374 (S.D. Ind. Sept. 14, 2015), is also distinguishable. There, the ALJ failed to address how the claimant could perform light work requiring him to walk or stand for up to six hours, given evidence that the claimant's treadmill stress test had to be terminated after approximately five minutes. As noted above, plaintiff here points to no evidence contradicting the ALJ's finding of light work restrictions.

Plaintiff next asserts that the ALJ erred by not considering the functional effects of plaintiff's sleep apnea beyond step three. However, the ALJ did, in fact, address plaintiff's sleeping issues. The ALJ noted plaintiff's contention that she was disabled due to numerous symptoms, including excessive daytime sleeping and lack of consistent nighttime sleep. (Tr. 38.) The ALJ explained, however, that the record did not yield objective findings that corroborated

16

the plaintiff's characterization of her symptoms. In specifically addressing plaintiff's sleeping problems, the ALJ stated, "Although she has been diagnosed with COPD and obstructive sleep apnea, the degree of these impairments is mild, as she displayed no active symptoms, such as wheezing, at her consultative physical examinations with Dr. Chapa, who noted that her lungs were clear. (Tr. 39.) The ALJ also found plaintiff not credible due to her gaps in medical treatment and inconsistent statements. (Tr. 40.) In sum, the ALJ built a logical bridge between her finding that plaintiff had a severe impairment of sleep apnea and a finding of non-disability.

## Conclusion

The Commissioner's final decision denying Lisa Reyes' application for social security disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

DATE: August 10, 2017

                                            s/ J. Phil Gilbert
                                            **J. PHIL GILBERT**
                                            **DISTRICT JUDGE**